DISTRICT COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

BARI ZAHN,                                              Index No. 15-CV-2926

                    PLAINTIFF,         **FIRST AMENDED**
                            **COMPLAINT**

          -against-                        JURY DEMAND
                            ON ALL COUNTS

KAYE SCHOLER LLP,

                    DEFENDANT.
-----------------------------------------------------------------------x

      **PLAINTIFF**, **BARI ZAHN**, by her attorneys, The Kurland Group, 160 Broadway, East

Building, 11th Floor, New York, New York, 10038, complaining of the **DEFENDANT**, alleges:

### NATURE OF ACTION

1.      **PLAINTIFF BARI ZAHN** (hereinafter referred to as "**MS. ZAHN**" or

"**PLAINTIFF**") brings this action against **DEFENDANT KAYE SCHOLER LLP** (hereinafter

referred to as "**KAYE SCHOLER**" or "**DEFENDANT**") for violations of **PLAINTIFF'S** rights

under the Federal laws, and laws of the State and City of New York, including, but not limited to,

42 U.S.C. §§ 2000e, *et seq.* (hereinafter referred to as "Title VII"), New York Executive Law §§

290, *et seq.* (hereinafter referred to as "New York State Human Rights Law") New York City

Administrative Code and Charter, §§ 8-101, *et seq.* (hereinafter referred to as "New York City

Human Rights Law"), 29 U.S.C. §§ 206, *et seq.* (enforced through the Fair Labor Standards Act

and the penalty provisions therein, and hereinafter referred to as "Equal Pay Act"), N.Y. Labor

Law §§ 194, *et seq.* (enforced through the New York Labor Law and the penalty provisions therein,

hereinafter referred to as "New York Equal Pay Law"), as well as breach of **KAYE SCHOLER'S**

employment policies and procedures, including as outlined in its employment handbook, and

causes of action including Breach of Contract, Tortious Interference with Business Relations, Fraudulent Inducement, and Unjust Enrichment.

2.      Remedial relief, damages, and other legal and equitable relief are sought under Title VII, New York State Human Rights Law, New York City Human Rights Law, Equal Pay Act, New York Equal Pay Law, and other applicable laws.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the parties and the subject matter of this action.

4.      Venue is proper in New York County as the causes of action arose in New York County and the **PLAINTIFF** resides in New York County.

5.      The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## JURY DEMAND

6.      **PLAINTIFF** demands a trial by jury in this action on each and every one of her damage claims.

## CONDITIONS PRECEDENT

7.      On or about August 29, 2014, **PLAINTIFF** duly filed a Charge of Discrimination against **DEFENDANT** with the Equal Employment Opportunity Commission (hereinafter referred to as "EEOC") (*See* **Exhibit A**, First EEOC Charge).  On or about September 26, 2014, **PLAINTIFF** duly filed a Supplemental Charge of Discrimination against **DEFENDANT** with the EEOC (*See* **Exhibit B**, Supplemental EEOC Charge).  And on or about December 23, 2014, **PLAINTIFF** duly filed a Second Supplemental Charge of Discrimination against **DEFENDANT** with the EEOC (*See* **Exhibit C**, Second Supplemental EEOC Charge).

8.      On or about December 21, 2014, **PLAINTIFF** received Right to Sue letters for her federal claims, issued by the EEOC, regarding her initial Charge of Discrimination and her first Supplemental Charge of Discrimination (*See* **Exhibit D**, First Notice of Right to Sue issued to Bari Zahn, and **Exhibit E**, Second Notice of Right to Sue issued to Bari Zahn).  On or about December 30, 2014, **PLAINTIFF** received a third Right to Sue letter for her federal claims, issued by the EEOC, for her Second Supplemental Charge (*See* **Exhibit F**, Third Notice of Right to Sue issued to Bari Zahn).

9.      As such, **PLAINTIFF** has satisfied all conditions precedent to commencing this action.

## PARTIES

10.     **PLAINTIFF** is, and for all relevant times in regards to this action was, a resident of the State of New York, County of New York, residing at 300 West 23rd Street, New York, NY 10011.

11.     **KAYE SCHOLER** is a Domestic Registered Limited Liability Partnership under the laws of the United States of America and the State of New York with a principal place of business located at 250 West 55th Street, New York, NY 10019.

12.     During all relevant times, **PLAINTIFF** was an employee of **KAYE SCHOLER.**

## STATEMENT OF FACTS

13.     **MS. ZAHN** was employed by **KAYE SCHOLER** from October 13, 2009 through December 31, 2014.

14.     While **PLAINTIFF** was hired by **DEFENDANT** as a Senior Associate, her job duties were that of a rainmaker, to develop business across all practice areas of the firm.

15.     **PLAINTIFF** alleges that her supervisor, Gary Gartner, a then-Partner at **KAYE SCHOLER** and head of the Tax Department (hereinafter referred to as "Mr. Gartner"), confirmed when she was hired that she would be on track to become a Partner provided she met her

obligations to bring in business.

16.     **PLAINTIFF'S** employment terms when she was hired in 2009 included a base salary of only Seventy Five Thousand Dollars ($75,000.00), Thirty Five Percent (35%) commissions on legal fees generated and collected up to Two Hundred Fifty Thousand Dollars ($250,000.00), and Ten Percent (10%) commissions thereafter (**Exhibit G**, Employment Terms dated October 13, 2009, hereinafter referred to as "First Employment Terms").

17.     **PLAINTIFF** asserts she was paid a fraction of what her male counterparts earned who performed the same or similar job functions, despite the fact that she is as qualified or more qualified than them.

18.     Further, according to publicly-available salary data, first year associates who have significantly less experience than senior associates like **PLAINTIFF**, and do not even perform the rainmaking function that **PLAINTIFF** performed, are paid a base salary of approximately One Hundred Sixty Thousand Dollars ($160,000.00) by **KAYE SCHOLER**.[1]

19.     Although she performed the same or similar job functions as many straight, male counterparts who also acted as rainmakers, focusing their time and energy on bringing in business for **DEFENDANT**, **PLAINTIFF** alleges that she was not given the same support, resources, payment or respect as her straight, male counterparts, and was treated differently and adversely because of her gender, her sexual orientation, and/or her advocacy in the Lesbian, Gay, Bisexual, Transgender, and Queer (hereinafter referred to as "LGBTQ") community.

20.     **PLAINTIFF** proved herself to be a valuable resource for **DEFENDANT** bringing in significant revenue, which in Plaintiff's best estimation is close to Two Million Dollars ($2,000,000.00) during her employment with **KAYE SCHOLER**.     Yet despite her

---

[1] *See* **KAYE SCHOLER** – New York Salaries and Profits Per Partner, *available at* http://www.lawfirmstats.com /firms/Kaye-Scholer/New-York-office/compensation.php (last visited May 13, 2015).

accomplishments and productivity, **PLAINTIFF** alleges that **DEFENDANT** refused to treat her equally, pay her comparably to her male counterparts, or even honor the agreements which **PLAINTIFF** had relied on when she began her employment.

21.     At the end of 2011, **PLAINTIFF'S** agreement with **DEFENDANT** stated that if **KAYE SCHOLER** wanted to renew **PLAINTIFF'S** employment terms, they would increase her commissions on the first Two Hundred Fifty Thousand Dollars ($250,000.00) in collections from Thirty Five Percent (35%) to Fifty Percent (50%) (**Exhibit G**, First Employment Terms), however **PLAINTIFF** alleges that **DEFENDANT** refused to honor this agreement (**Exhibit H**, Employment Terms dated February 22, 2012[2]).

22.     **PLAINTIFF** further alleges that she was required by **DEFENDANT** to perform tasks for which she was not compensated and were outside the scope of her job responsibilities.  By way of example, **PLAINTIFF** claims **DEFENDANT** required her to coordinate a Supplier Diversity Program for Novartis, one of **KAYE SCHOLER'S** biggest clients and a Corporate Partner of the National Gay and Lesbian Chamber of Commerce.  This project required a substantial amount of **PLAINTIFF'S** time, for which she was not compensated, and which was outside of the scope of the duties and terms of her employment.

23.     **PLAINTIFF** alleges that additional firm-related matters in which she participated that were outside the scope of her duties, and for which she was not compensated, include but are not limited to:

    a. Billing for client matters, for example, **PLAINTIFF** alleges that she billed approximately Eighty Thousand Dollars ($80,000.00) in 2012 for Toyota Financial Services, and approximately Twenty Thousand Dollars ($20,000.00) in 2013 for

---

[2] It bears noting that when **DEFENDANT** forced **PLAINTIFF** to renew her First Employment Terms in 2012, they changed her title without comment from "senior associate" to "contract associate."

employment-related matters, as well as billing on many other matters;

b. Creating CLEs at the request of Talent Development and/or Practice Leaders;

c. Overseeing summer associate legal assignments;

d. Participating in Lavender Law interviews in 2012 and 2013 at the request of Talent Development;

e.Engaging in any other activity requested by a firm-partner, such as being on calls as an EB-5 expert; and

f. Working with the firm to source pro bono work, such as supporting the Anti-Violence Project in setting up their new legal clinic.

24.     In September 2012, **PLAINTIFF** spoke with her supervisor, Mr. Gartner, and expressed her concerns regarding her unequal compensation.  Mr. Gartner acted on behalf of **DEFENDANT** when he hired **PLAINTIFF** as a senior associate in the tax department, Mr. Gartner approved **PLAINTIFF'S** employment terms with **DEFENDANT**, and had the authority to change such terms, including increasing her pay, adjusting her compensation package and authorizing other changes to her contract.

25.     At the same meeting, **PLAINTIFF** also spoke with Mr. Gartner about being made Partner (or at minimum Counsel), as well as the ongoing issues with ensuring that she receive referral credit for the business she brought into the firm, the significant time she was spending on matters outside the scope of her agreement for which she was not being paid and the lack of support and respect shown to her by the firm's new Co-Managing Partner, Michael Solow (hereinafter referred to as "Mr. Solow"), and Stephen Gliatta, then Chair of the firm's Executive Committee and Co-Chair of its Real Estate Department (hereinafter referred to as "Mr. Gliatta").

26.     Mr. Gartner had always set and approved **PLAINTIFF'S** employment terms on behalf of

**DEFENDANT**, including her rate of pay.  In June 2013, Mr. Gartner provided **PLAINTIFF** with new employment terms commensurate with **PLAINTIFF'S** counterparts, including a base salary equal to that of a 2nd or 3rd year Counsel, a new commission structure, clear parameters for a discretionary bonus, a pre-approved expense budget, and a title commensurate with **PLAINTIFF'S** role in the firm (*See* **Exhibit I**, hereinafter referred to as "Second Employment Terms") as a result of **PLAINTIFF** having raised concerns regarding her rate of pay compared to similarly situated male employees.

27.    Soon thereafter, Mr. Gartner left **KAYE SCHOLER** and rather than honoring the Second Employment Terms, **DEFENDANT** orchestrated and initiated a strategy to circumvent the Second Employment Terms by making **PLAINTIFF** submit reports to justify the terms, attend meetings to discuss the terms, and ultimately waiting until the 11th hour, just days before her agreement would expire, at which point, on November 29, 2013, Mr. Solow offered **PLAINTIFF** yet another set of employment terms, including a base salary of One Hundred Seventy Five Thousand Dollars ($175,000.00), no commissions on any collections under One Million Dollars ($1,000,000.00), and a cap at Five Hundred Twenty Thousand Dollars ($520,000.00) (**Exhibit J**, hereinafter referred to as "Third Employment Terms"), that still did not equalize or properly redress **PLAINTIFF'S** underpayment.

28.    On behalf of **DEFENDANT**, Mr. Solow made clear that they would not honor the Second Employment Terms and with the fear of being terminated unless she either disavowed her request for an appropriate increase in pay and go back to her initial First Employment Terms or accept **DEFENDANT'S** Third Employment Terms, **PLAINTIFF** was forced to accept the Third Employment Terms, which **PLAINTIFF** continues to assert undervalues her work and underpays her in violation of the law (*See* **Exhibit M**, 2014 Agreement).

7

29.     Throughout **PLAINTIFF'S** career, she has received numerous commendations for her work.  Most recently, in April 2014 **PLAINTIFF** was honored by Brooklyn Law School for her work in the LGBTQ community.  **PLAINTIFF** is a well-known and highly respected leader in the LGBTQ community and beyond.

30.     **PLAINTIFF** is the Chair of the Legal Industry Council for the National Gay and Lesbian Chamber of Commerce, and she founded an HIV/AIDS youth-based organization that is now under the auspices of the Hetrick-Martin Institute.

31.     **PLAINTIFF** also received the New York State Bar Association's Empire State Counsel Honoree Pro-Bono Provider Award and was honored as one of the top 100 pro bono legal providers in New York City.

32.     **PLAINTIFF** is highly valued by her clients who appreciate the excellence in her performance and often refer her for repeat business and new clients.

33.     These credentials increase **PLAINTIFF'S** effectiveness as a rainmaker, which is a highly valued, and normally substantially compensated, position.  Upon information and belief, the base salaries of **DEFENDANT'S** male employees who perform similar jobs range from Five Hundred Thousand Dollars ($500,000.00) to over One Million Dollars ($1,000,000.00) per year.

34.     **PLAINTIFF'S** base salary was only Seventy Five Thousand Dollars ($75,000.00) from 2009 through 2013.  While **DEFENDANT** increased **PLAINTIFF'S** base salary to One Hundred Seventy Five Thousand Dollars ($175,000.00) for 2014, they simultaneously eliminated **PLAINTIFF'S** potential commissions for collections under One Million Dollars ($1,000,000.00).

35.     Despite this, **PLAINTIFF** alleges that she met or exceeded her business development goals, and she brought close to Two Million Dollars ($2,000,000.00) in revenue and millions of dollars in future work to **DEFENDANT** from clients she has developed and originated, including

Kenneth Cole, Toyota Financial Services, and Merisant, the company that owns Equal and Pura Via.  In 2014, **PLAINTIFF** was also working on developing deals for **DEFENDANT**, including but not limited to deals with Morgan Stanley, Freddie Mac, and Office Depot.

36.     Despite **PLAINTIFF'S** excellence in performance, upon information and belief she was paid only a fraction of what her straight, male counterparts were paid.  **PLAINTIFF** alleges that she was routinely undervalued, unsupported, and treated adversely.

37.     Attached hereto as **<u>Exhibit K</u>** is a letter dated June 9, 2014 that details further specific ways in which **PLAINTIFF** alleges she faced hurdles and setbacks with **DEFENDANT** as a member of the LGBTQ community, different from her straight, male counterparts whose work, upon information and belief, was supported by **DEFENDANT**.

38.     Attached hereto as **<u>Exhibit L</u>** is an outline of serious concerns raised to **DEFENDANT** by **KAYE SCHOLER'S** LGBTQ working group.

39.     **PLAINTIFF** asserts that her base salary was substantially less then what male attorneys doing similar work, with similar experience and skills, are paid at **KAYE SCHOLER**.

40.     Upon information and belief, male attorneys who performed the same or similar work as **PLAINTIFF**, with similar experience and skill, but were compensated significantly more by **DEFENDANT** include but are not limited to Larry Feldman, an attorney who William Zifchak, a Special Counsel in the Employment and Labor Law group of **KAYE SCHOLER'S** Litigation Department (hereinafter referred to as "Mr. Zifchak") acknowledged had a job description similar to **PLAINTIFF**.

41.     **PLAINTIFF** alleges that she was also not given the standard incentives for her business development, such as Origination Credit, which significantly affected her compensation.

42.     While **PLAINTIFF** was originally told by Mr. Gartner that the reason she would not

receive the Origination Credit for her clients was because the Origination Credit needed to serve as an incentive to partners to work with her on business development, she later learned that, upon information and belief, partners who worked with her to bring in business were only being given Transfer Origination Credit, which is much less valuable than standard Origination Credit. This disincentivized partners from working with **PLAINTIFF** to develop business and created an environment of isolation, devaluation and unfair compensation for **PLAINTIFF**.

43.     **PLAINTIFF** alleges that she was repeatedly forced to sign contracts that severely underpaid her. When her supervisor, Mr. Gartner, finally did approve her Second Employment Terms, which came closer to paying her at an equal rate, those employment terms were revoked by **DEFENDANT** and **PLAINTIFF** was told she had to either disavow her request for an appropriate increase in pay and go back to her initial First Employment Terms or accept **DEFENDANT'S** Third Employment Terms, which severely undervalued her work, or else she would be out of a job.

44.     As an example of the hostility **PLAINTIFF** was forced to endure, when she tried to bring in business from a long-sought company, in specific, Starwood Capital in 2011/2012, with whom she had developed personal contacts and strong relations, including with the Co-General Counsel, Madison Grose, **PLAINTIFF** alleges that she was flatly told that no one from **KAYE SCHOLER'S** Real Estate Group would attend the meeting she had scheduled or provide her the support she needed.

45.     **PLAINTIFF** asserts that she was left with no opportunity to further her business development with Mr. Grose, who had introduced her to his Co-General Counsel of Real Estate, Ellis Rinaldi, who had specifically requested that she bring **KAYE SCHOLER'S** top real estate lawyer to the meeting.

46.    Ultimately, **PLAINTIFF** alleges that she was explicitly precluded from pursuing real estate-related business, despite the fact that this had a significant adverse impact on her income as real estate-related business comprised one-third of her strategic plan.

47.    Upon information and belief, this preclusion was fueled by discriminatory animus of **PLAINTIFF'S** sexual orientation and gender, as **PLAINTIFF** alleges it is well-known that both of the Co-Chairs of **DEFENDANT'S** Real Estate Department, Mr. Bernstein and Mr. Gliatta, are homophobic, along with numerous other powerful partners at **KAYE SCHOLER**, which is known as a firm that does not value diversity.[3]

48.    According to numerous diversity reports, including but not limited to the New York City Bar Association's Benchmarking Reports, **KAYE SCHOLER** also does not value or properly promote or compensate women.[4]  **PLAINTIFF** alleges that **DEFENDANT** created a work environment in which women like **PLAINTIFF** were not given the same support or resources as their male counterparts, reinforcing their exclusion from the "Boys Club."

49.    Further, in late 2009, **PLAINTIFF** alleges that she set a meeting for Mr. Bernstein, one of

---

[3] According to publicly-available data regarding the demographics of **KAYE SCHOLER,** the firm's partners are only 3.3% Black/African American, 0.8% Hispanic/Latin American, 2.4% Asian, and 0.2% LGBT.  *See* Chambers Associate Profile on **KAYE SCHOLER** LLP, *available at* http://www.chambers-associate.com/FirmFeature/3630 (last visited May 13, 2015).  Further, **KAYE SCHOLER'S** 2015 Vault Ranking cites "lack of diversity" as one of the Firm's top three problems.  *See* 2015 Vault Rankings, *available at* http://www.vault.com/company-profiles/law/kaye-scholer-llp/company-reviews (last visited May 13, 2015).

[4] Upon information and belief, **KAYE SCHOLER'S** New York office has not promoted a woman to partner in approximately the last seven (7) years and the New York office has promoted only one (1) woman to partner in approximately the last eight (8) years.  Even including all offices of **KAYE SCHOLER** (domestic and foreign), the percentage of women promoted to partner is shockingly low.  *See* Chambers Associate Profile on **KAYE SCHOLER** LLP, *available at* http://www.chambers-associate.com/FirmFeature/3630 (last visited May 13, 2015) (stating that **KAYE SCHOLER'S** partners are only 17.9% female.)

Upon information and belief, at **KAYE SCHOLER'S** New York office, the percentage of women promoted to partner during the time period from 2007 - 2014 was only 6.67% and for all of **KAYE SCHOLER'S** offices combined, the percentage was only 15.38%.  According to the New York City Bar Association's Benchmarking Reports, at **KAYE SCHOLER'S** peer New York City firms, women averaged approximately 33% of the new partner promotes in each year during the same 2007 - 2014 period for which such information was reported to the NYC Bar Association. *See* NYC Bar Benchmarking Reports, *available at* http://www.nycbar.org/diversity/benchmarking-reports (last visited May 13, 2015).

the Co-Chairs of **KAYE SCHOLER'S** Real Estate Department, with Charles Katzenstein, the General Counsel of TF Cornerstone.   Mr. Katzenstein, who self-identifies as gay, asked if **PLAINTIFF** could have a qualified LGBTQ real estate counsel or partner attend the pitch.

50.   When **PLAINTIFF** told Mr. Bernstein of Mr. Kazenstein's request, and suggested that Ian Tattenbaum, a qualified counsel in the real estate department, attend the pitch, Mr. Bernstein became quite agitated.   **PLAINTIFF** alleges that Mr. Bernstein responded to her in a loud and hostile voice and said that if Mr. Kazenstein cared about whether or not an LGBTQ lawyer is on the pitch, then he does not want him as a client.

51.   Mr. Bernstein did not bring Mr. Tattenbaum on the pitch and **KAYE SCHOLER** did not get TF Cornerstone's work, which included the refinancing of numerous loans on Long Island City commercial properties which **PLAINTIFF** estimates totaled more than Two Hundred Million Dollars ($200,000,000.00).[5]

52.   On a separate occasion, **PLAINTIFF** alleges she was told by Gina DiGennaro Pollock, a former business development manager at **KAYE SCHOLER**, that she was prevented from sending out an invitation to a firm-sponsored CLE entitled "Life and Legacy Planning for the Modern Family" that the former Tax Department Chair had requested **PLAINTIFF** put together, because certain partners at the firm, including Mr. Bernstein and Mr. Gliatta, did not want their clients to see the invitation, which among many different pictures of modern families, included a picture of two women with a child and two men together depicting gay relationships.

53.   Not only did these incidents cause **PLAINTIFF** humiliation and hurt her business contacts, but **PLAINTIFF** alleges that it also prevented her from earning compensation based on her business development.   It also creates a discriminatory atmosphere that has an adverse impact on

---

[5] It bears noting that this was the only pitch that one of the Co-Chairs of the Real Estate Department ever agreed to attend on **PLAINTIFF'S** behalf, despite **PLAINTIFF'S** numerous subsequent requests.

**PLAINTIFF**.

54.     **PLAINTIFF** alleges that **DEFENDANT** further jeopardized her ability to develop business in or around December 2013 when Josette Winograd, the Director of Business Development at **KAYE SCHOLER**, began requiring **PLAINTIFF** to obtain pre-approval of all her expenditures, even those below Two Hundred Fifty Dollars ($250.00), which upon information and belief was not required of any other attorneys, and especially not other rainmakers.

55.     Despite the disparate and adverse treatment that **PLAINTIFF** faced, she continuously showed that she is a team player, exemplifying the highest caliber of professionalism and working for a substantial period of time trying to remedy these concerns, despite a backdrop of serious firm-wide concerns regarding women being underpaid, undervalued, and not advanced to positions of power and leadership, and members of the LGBTQ community being marginalized and mistreated.

56.     **PLAINTIFF** made clear to **DEFENDANT** that she wished to bring her whole self to work, to be supported in her rainmaking efforts and truly be part of the team at **KAYE SCHOLER**. Unfortunately, however, because of the hostile, discriminatory beliefs and attitudes of **DEFENDANT** and its leadership, she was unable to do so.

57.     Instead, **PLAINTIFF** alleges that she was punished for being who she is, humiliated in the eyes of her colleagues and those of power and prestige in her business network, undervalued, underpaid and treated differently and adversely.  Upon information and belief, **DEFENDANT** even initially refused to approve **PLAINTIFF'S** attendance at a National Gay and Lesbian Chamber of Commerce ("NGLCC") meeting in Washington, D.C. in March 2014, as well as the annual NGLCC conference in August of 2014, despite the fact that **PLAINTIFF** is Chair of the Legal Industry Council for the NGLCC, which greatly benefits **DEFENDANT**.

58.     **PLAINTIFF** tried repeatedly in good faith to resolve these problems, but **PLAINTIFF**

alleges that **DEFENDANT** refused to take seriously her concerns or even show her the dignity of responding to her formal complaint, which she filed with Dana Morgan in the Human Resources Department on April 8, 2014 asking that **DEFENDANT** resolve these issues.  Attached hereto as **Exhibit N** is a copy of this complaint.

59.     Mr. Zifchak was identified as the attorney designated to handle the investigation of **PLAINTIFF'S** claims, however rather than properly investigating **PLAINTIFF'S** claims, or taking seriously her legitimate concerns, **PLAINTIFF** alleges that Mr. Zifchak challenged her assertions and sent **PLAINTIFF** on a wild goose chase to submit documents to defend her statements.

60.     The only reason **DEFENDANT** gave when **PLAINTIFF** asked why she was paid so much less than her male counterparts doing similar work was the claim that it was because these men also completed billable hours.  However, the performance of billable hours is irrelevant to **PLAINTIFF** being underpaid and the relevant duties of **PLAINTIFF'S** job.  Further, upon information and belief, there are several male rainmakers who do not complete billable hours and are still paid substantially more than **PLAINTIFF**.

61.     Despite **PLAINTIFF'S** submission of a formal complaint to the Human Resources Department on April 8, 2014 (**Exhibit N**), **PLAINTIFF** alleges that **DEFENDANT** failed to properly respond, including failing to properly investigate, publish or provide any written decision or take corrective action.

62.     Despite having promised to respond with a written counteroffer, Mr. Zifchak immediately backed out of the mediation process in a bad faith effort to simply get **PLAINTIFF** to show her hand.

63.     Over four (4) months after filing this Human Resources complaint, when **PLAINTIFF** had

still not received an adequate response, despite numerous requests, she filed a Charge of Discrimination with the EEOC on August 29, 2014.

64.    On August 29, 2014, after filing the EEOC Complaint, **PLAINTIFF'S** attorney notified Mr. Zifchak about this filing and provided him with a copy of the filed complaint.  That notification is attached as **Exhibit O**.

65.    Then, without explanation, on September 18, 2014, approximately 20 days after **PLAINTIFF** noticed the **DEFENDANT** of her initial complaint with the EEOC, **DEFENDANT** changed **PLAINTIFF'S** office assignment to Office 720, which is six floors below where the rest of the transactional attorneys she worked with were located.

66.    This is significant because in the course of **PLAINTIFF'S** work as a rainmaker for **DEFENDANT**, almost all of her interactions with other attorneys in the firm were limited to other transactional lawyers.  **PLAINTIFF** collaborated with these transactional attorneys to bring in work to the firm and to work on transactions in her capacity as a relationship attorney, and general outside counsel for clients, while at times billing for work she undertakes in specific practice areas, such as with employment-related matters.

67.    By being able to easily access other transactional lawyers at the firm, **PLAINTIFF** gained a greater understanding of the type of matters/representations that were of interest to the firm, the kinds of issues that arise in the firm's various transactional practice areas, and the ways in which to develop and leverage her relationships with such attorneys within the firm who have similar corporate transactional backgrounds as her own.

68.    **PLAINTIFF** alleges that this daily interaction led to increased efficiency and enhanced **PLAINTIFF'S** ability to bring in new deals and clients to the firm, while providing such clients with the depth and breadth of a global firm, along with specialized attention and service found in

a boutique firm.   This arrangement helped **PLAINTIFF** to originate new business for **DEFENDANT** and cultivate existing client relationships to foster future business opportunities.

69.     **DEFENDANT** knows the value of placing lawyers in departments that suit them, as all of the firm's employees are divided into departments.

70.     From October 2009 until September 2014, **PLAINTIFF'S** office was in close proximity to the Tax and Private Clients Department and Corporate/Fund Formation Group, which are both comprised of primarily transactional lawyers.   But once **PLAINTIFF** filed a Charge of Discrimination against **DEFENDANT** with the EEOC, (*See* **Exhibit A**), she was relocated in a way that alienated her from the team that she needed to work with and was therefore a materially adverse change in the terms and conditions of **PLAINTIFF'S** employment.  In fact, **PLAINTIFF** was moved to the Seventh Floor, which has no transactional lawyers at all.

71.     When **PLAINTIFF** learned of her office reassignment, she sent an email to Mr. Hunter, **KAYE SCHOLER'S** Chief Operating Officer, inquiring of the reason for her reassignment and explaining that her duties are best fulfilled when she is with the Tax and Private Clients Department team, as well as with other transactional lawyers with whom she works on a daily basis.  This email to Mr. Hunter is attached as **Exhibit P**.

72.     Mr. Hunter refused to reassign **PLAINTIFF** and instead responded by stating that her placement in the Tax and Private Clients Department for the previous five (5) years had been an error, and that **PLAINTIFF** was actually a "functional equivalent of a staff person."  This response is attached as **Exhibit Q**.

73.     **PLAINTIFF** alleges that both the office reassignment and Mr. Hunter's response are retaliatory actions based on **PLAINTIFF'S** initial EEOC Complaint (**Exhibit A**) and how belittled and devalued **PLAINTIFF'S** work was by **DEFENDANT**.

74.     On or about September 26, 2014, **PLAINTIFF** filed a Supplemental EEOC Complaint against **DEFENDANT**, which is attached as **<u>Exhibit B</u>**, and which outlines these retaliatory actions **DEFENDANT** took against her after she complained of their mistreatment.

75.     **PLAINTIFF** alleges that subsequent to **PLAINTIFF'S** Second EEOC Complaint, **DEFENDANT** still took no remedial actions, such as a proper investigation of her concerns and/or a report to that effect.

76.     Instead, **DEFENDANT** informed **PLAINTIFF** on or around December 3, 2014 that they were terminating her employment.  This was the ultimate act of retaliation and was a wrongful termination.

77.     **PLAINTIFF** requested multiple times to be provided with the reasons why **DEFENDANT** was terminating her employment, and on December 10, 2014, **DEFENDANT** provided **PLAINTIFF** with a Memorandum, attached hereto as **<u>Exhibit R</u>**, detailing the following reasons for her termination:

> (1)"From a risk management perspective, your conduct in the past year has not only given the Firm reason to question your professionalism, but going forward to lack confidence in your judgment and actions. The matters at issue include Cyprus Trust/GTIG, the Hackley School donation, and GRMAR, as well as collection of unpaid bills.
>
> (2)You were observed by Firm personnel engaging in inappropriate behavior at the NGLCC event in our Washington Office on November 19 and then again at the Gala dinner on November 21, where you left the dinner and your guests at the table midway through.
>
> (3)The Firm has discovered certain improprieties in your disbursement charges to the Firm.
>
> (4)After 5 years' experience, even at your current base salary, your collections history coupled with your spending habits does not warrant continuing our relationship. The Firm has decided that having an attorney who does not practice law attempt to develop business at a firm such as ours that specializes in sophisticated high end matters, is not tenable.

(5)Your salary demands are excessive and retaining you at such a level makes no business sense. In recent months, your attorney has demanded that your base annual salary be increased from $175,000 to as much as $600,000 and that you additionally receive an increased percentage of the business you generate. It is not economically viable for the Firm to continue your employment at anywhere near such a compensation level."

78.     First, to the extent that **DEFENDANT'S** Memorandum discusses **PLAINTIFF'S** professional behavior or etiquette, **PLAINTIFF** alleges that this was the first time any individual at **KAYE SCHOLER** had raised this issue with **PLAINTIFF**.

79.     **PLAINTIFF** had never received any indication from **DEFENDANT** that her professional behavior or etiquette was an issue, and **PLAINTIFF** was given no opportunity to remedy such alleged problem.

80.     Further, **PLAINTIFF'S** professional behavior and etiquette at the identified events did not deviate in any way from the normal behavior within **DEFENDANT'S** work environment, which raises serious questions as to whether **PLAINTIFF'S** straight, male counterparts were subject to the same standards of behavior and whether they were reprimanded in similar instances.

81.     Second, **DEFENDANT'S** identification of **PLAINTIFF'S** expenses being an issue was clearly pretext as this issue had already been fully resolved when **PLAINTIFF** provided Mr. Zifchak an explanation and resolution of the incorrect accounting records, which had led to certain expenses being erroneously allocated to **PLAINTIFF**.

82.     However, Mr. Zifchak had ignored **PLAINTIFF'S** prior statements and continued to claim that her expense budget was substantially larger than other similarly-situated partners.

83.     **PLAINTIFF** further asserts that these numerous accounting improprieties exemplify a discriminatory pattern and practice in **DEFENDANT'S** bookkeeping, which **DEFENDANT** refused to correct even after **PLAINTIFF** provided the documents necessary to substantiate her

concerns and resolve any issues.

84.     Finally, **DEFENDANT** shockingly admitted that they were terminating **PLAINTIFF** for having complained about unfair pay practices and in fact even reference her proposed remedy, that is the suggested pay increase **PLAINTIFF** submitted *for settlement purposes only* as part of the mediation, as the reason she is being terminated.  **DEFENDANT** stated, "Your salary demands are excessive and retaining you at such a level makes no business sense. In recent months, your attorney has demanded that your base annual salary be increased from $175,000 to as much as $600,000 and that you additionally receive an increased percentage of the business you generate. It is not economically viable for the Firm to continue your employment at anywhere near such a compensation level" (**Exhibit R**).

85.     Attached hereto as **Exhibit S** is a Statement of Claim for Mediation, which **PLAINTIFF'S** attorney provided to **DEFENDANT** on August 5, 2014 in preparation for resolving her claims of discrimination with **DEFENDANT** at mediation, which was scheduled to take place on August 12, 2014.  This is where **DEFENDANT** received **PLAINTIFF'S** proposed salary increase that they acknowledge was a reason they terminated **PLAINTIFF'S** employment.

86.     Instead of providing **PLAINTIFF** with the promised counteroffer to this Statement of Claim, **DEFENDANT** used her salary proposal as a cause for **PLAINTIFF'S** termination.

87.     As such, **DEFENDANT'S** termination of **PLAINTIFF'S** employment is not only a discriminatory action, but it is the very definition of retaliation.

88.     **PLAINTIFF** had expressed concern regarding her salary and proposed that her compensation package be equal to that of her straight, male counterparts who were performing the same or similar duties as her.  Instead of taking this proposal seriously, and discussing its merits

with **PLAINTIFF**, **DEFENDANT** retaliated by forcing her into a worse position and ultimately terminating her employment.

89.     **PLAINTIFF** alleges that this retaliatory action by **DEFENDANT** is the culmination of a sequence of retaliatory and discriminatory acts committed by **DEFENDANT** against **PLAINTIFF**, to which she now has no available remedy other than to pursue her claims in a court of law.

90.     **DEFENDANT** knew or should have known that this conduct was improper, but they did not investigate and/or correct it.   **DEFENDANT** failed to confront and/or correct the discriminatory treatment of **PLAINTIFF**, and this failure resulted in the discrimination, harassment, retaliation and wrongful termination of **PLAINTIFF**.

91.     **PLAINTIFF** alleges that there is no legitimate basis for **DEFENDANT'S** failure to compensate her equally to her straight, male counterparts who were performing the same or similar duties as her.  Further, **PLAINTIFF** alleges that there is no legitimate basis for **DEFENDANT'S** termination of **PLAINTIFF'S** employment.

92.     Further, **PLAINTIFF** alleges that **DEFENDANT'S** treatment of **PLAINTIFF** not only violated federal, state, and local laws, but also **KAYE SCHOLER'S** policies and procedures, including its employment handbook.

93.     **PLAINTIFF** alleges that **DEFENDANT** failed to provide proper training to their employees regarding discrimination, despite the need for such training, and this failure resulted in the discrimination, harassment, retaliation and wrongful termination of **PLAINTIFF**.

94.     The above described incidents created a hostile work environment and subjected **PLAINTIFF** to discriminatory treatment including but not limited to harassment, retaliation,

unequal pay, and wrongful termination because of her gender, sexual orientation and advocacy in the LGBTQ community during her employment with **KAYE SCHOLER**.

95.    The treatment **PLAINTIFF** received while employed by **KAYE SCHOLER** violates several laws, and as a proximate result of **DEFENDANT'S** wrongful conduct, **PLAINTIFF** has suffered, and continues to suffer, significant damages, including, but not limited to loss of job, loss of promotional opportunities, loss of wages, salaries and benefits, humiliation, embarrassment, pain and suffering and mental anguish.

**AS FOR THE FIRST CAUSE OF ACTION**
**AGAINST DEFENDANT FOR UNLAWFUL DISCRIMINATION**
**IN VIOLATION OF TITLE VII**

96.    **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

97.    **PLAINTIFF** is a woman, and therefore a member of a protected class, who was qualified for her position with **KAYE SCHOLER**, and yet she suffered numerous adverse employment actions, including but not limited to disparate pay and the termination of her employment by **DEFENDANT** under circumstances giving rise to an inference of discriminatory intent.

98.    **PLAINTIFF** was paid a fraction of what her male counterparts earned who performed the same or similar job functions, despite the fact that she is as qualified or more qualified than them.

99.    **PLAINTIFF'S** base salary was Seventy Five Thousand Dollars ($75,000.00) from 2009 through 2013. While **DEFENDANT** increased **PLAINTIFF'S** base salary to One Hundred Seventy Five Thousand Dollars ($175,000.00) for 2014, they simultaneously eliminated **PLAINTIFF'S** potential bonus payments for collections under One Million Dollars ($1,000,000.00). Upon information and belief, the base salaries of **DEFENDANT'S** male

employees who perform similar jobs range from Five Hundred Thousand Dollars ($500,000.00) to over One Million Dollars ($1,000,000.00) per year.

100.    After **PLAINTIFF** expressed concern regarding her salary and proposed that her compensation package be equal to that of her male counterparts who were performing the same or similar duties as her, instead of taking this proposal seriously, and discussing its merits with **PLAINTIFF**, **DEFENDANT** retaliated against **PLAINTIFF**, by forcing her into a worse contract and ultimately terminating her employment.

101.    **DEFENDANT'S** failure to provide **PLAINTIFF** with support, resources, payment or respect equal to that of males doing equal or comparable work is discriminatory and violates Title VII.

102.    By the acts and practices described above, **DEFENDANT** has discriminated against **PLAINTIFF** because of her gender in violation of Title VII.

103.    **DEFENDANT** knew or should have known that their actions constituted unlawful discrimination on the basis of gender and/or showed reckless disregard for **PLAINTIFF'S** statutorily protected rights.

104.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE SECOND CAUSE OF ACTION**
**AGAINST DEFENDANT FOR UNLAWFUL DISCRIMINATION**
**IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**

105.    **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

106.    **PLAINTIFF** is a woman and a member of the LGBTQ community, and therefore a member of a protected class, who was qualified for her position with **KAYE SCHOLER**, and yet she suffered numerous adverse employment actions, including but not limited to disparate pay and the termination of her employment by **DEFENDANT** under circumstances giving rise to an inference of discriminatory intent.

107.    **PLAINTIFF** was paid a fraction of what her straight, male counterparts earned who performed the same or similar job functions, despite the fact that she is as qualified or more qualified than them.

108.    **PLAINTIFF'S** base salary was Seventy Five Thousand Dollars ($75,000.00) from 2009 through 2013.   While **DEFENDANT** increased **PLAINTIFF'S** base salary to One Hundred Seventy Five Thousand Dollars ($175,000.00) for 2014, they simultaneously eliminated **PLAINTIFF'S** potential bonus payments for collections under One Million Dollars ($1,000,000.00).   Upon information and belief, the base salaries of **DEFENDANT'S** male employees who perform similar jobs range from Five Hundred Thousand Dollars ($500,000.00) to over One Million Dollars ($1,000,000.00) per year.

109.    After **PLAINTIFF** expressed concern regarding her salary and proposed that her compensation package be equal to that of her straight, male counterparts who were performing the same or similar duties as her, instead of taking this proposal seriously, and discussing its merits with **PLAINTIFF**, **DEFENDANT** retaliated by forcing her into a worse position and ultimately terminating her employment.

110.    **PLAINTIFF** was not given the same support, resources, payment or respect as her straight, male counterparts, and she was treated differently and adversely because of her gender, her sexual orientation, and her advocacy in the LGBTQ community.

111.    Not only did **DEFENDANT** subject **PLAINTIFF** to humiliation and harm to her reputation, but they also prevented **PLAINTIFF** from earning compensation based on her business development when they impeded her access to potential clients and contacts in the LGBTQ community by denying her requests for expenses for LGBTQ events.

112.    **DEFENDANT'S** failure to provide **PLAINTIFF** with support, resources, payment or respect equal to that of straight, males doing equal or comparable work is discriminatory and violates the New York State Human Rights Law.

113.    By the acts and practices described above, **DEFENDANT** has discriminated against **PLAINTIFF** because of her gender and actual or perceived sexual orientation in violation of the New York State Human Rights Law.

114.    **DEFENDANT** knew or should have known that their actions constituted unlawful discrimination on the basis of gender and actual or perceived sexual orientation and/or showed reckless disregard for **PLAINTIFF'S** statutorily protected rights.

115.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

### AS FOR THE THIRD CAUSE OF ACTION
### AGAINST DEFENDANT FOR UNLAWFUL DISCRIMINATION
### IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW

116.    **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

117.    **PLAINTIFF** is a woman and a member of the LGBTQ community, and therefore a member of a protected class, who was qualified for her position with **KAYE SCHOLER**, and yet she suffered numerous adverse employment actions, including but not limited to disparate pay and

the termination of her employment by **DEFENDANT** under circumstances giving rise to an inference of discriminatory intent.

118.   **PLAINTIFF** was paid a fraction of what her straight, male counterparts earned who performed the same or similar job functions, despite the fact that she is as qualified or more qualified than them.

119.   In addition to the pay disparities alleged above, **PLAINTIFF** was not given the same support, resources, or respect as her straight, male counterparts, and she was treated differently and adversely because of her gender, her sexual orientation, and her advocacy in the LGBTQ community.  Not only did **DEFENDANT** subject **PLAINTIFF** to humiliation and harm to her reputation, but they also affirmatively impeded **PLAINTIFF'S** ability to bring in clients from the LGBTQ community, for example when Mr. Bernstein refused to bring a qualified LGBTQ real estate counsel or partner to a pitch with General Counsel of TF Cornerstone, who openly identifies as gay and requested that Ian Tattenbaum, an openly gay, qualified Counsel in the Real Estate Department, attend the pitch.

120.   **DEFENDANT'S** failure to provide **PLAINTIFF** with support, resources, payment or respect equal to that of straight, males doing equal or comparable work is discriminatory and violates the New York City Human Rights Law.

121.   By the acts and practices described above, **DEFENDANT** has discriminated against **PLAINTIFF** because of her gender and actual or perceived sexual orientation in violation of the New York City Human Rights Law.

122.   **DEFENDANT** knew or should have known that their actions constituted unlawful discrimination on the basis of gender and actual or perceived sexual orientation and/or showed reckless disregard for **PLAINTIFF'S** statutorily protected rights.

123.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE FOURTH CAUSE OF ACTION**
**AGAINST DEFENDANT FOR WRONGFUL TERMINATION**
**IN VIOLATION OF TITLE VII**

124.    **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

125.    By the acts and practices described above, **DEFENDANT** has wrongfully terminated **PLAINTIFF** because of her gender in violation of Title VII.

126.    **PLAINTIFF** is a member of a protected class and suffered an adverse employment action when she was wrongfully terminated on December 3, 2014, although she was qualified to perform her job and had been performing her job well for over five (5) years.

127.    **PLAINTIFF** alleges that there is no legitimate basis for **DEFENDANT'S** termination of **PLAINTIFF'S** employment.

128.    **DEFENDANT'S** stated reasons for terminating **PLAINTIFF'S** employment included a discussion for the first time regarding **PLAINTIFF'S** professional behavior or etiquette, despite the fact that **PLAINTIFF** had never received any indication from **DEFENDANT** that her professional behavior deviated in any way from the normal behaviors of her male counterparts within **DEFENDANT'S** work environment nor had she received any admonishments, prior complaints or opportunities to remedy or even respond to these allegations, which **PLAINTIFF** believes to be untrue and without merit.

129.    **DEFENDANT** also claimed that **PLAINTIFF'S** expenses were improper, despite the fact that **PLAINTIFF** had already clarified this was not the case.

130.   Finally, **DEFENDANT** admits that they terminated **PLAINTIFF** for having complained about unfair pay practices and in fact even reference her proposed remedy, that is the suggested pay increase **PLAINTIFF** submitted *for settlement purposes only* as part of the mediation, as the reason she is being terminated.  This not only calls into question the required confidentiality of these discussions but shows *prima facie* that **PLAINTIFF** was terminated for asking that her pay be adjusted so that it was in line with her male counterparts.

131.   **DEFENDANT** knew or should have known that their actions constituted unlawful discrimination on the basis of gender and sexual orientation and/or showed reckless disregard for **PLAINTIFF'S** statutorily protected rights.

132.   As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**<u>AS FOR THE FIFTH CAUSE OF ACTION</u>**
**<u>AGAINST DEFENDANT FOR WRONGFUL TERMINATION</u>**
**<u>IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW</u>**

133.   **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

134.   By the acts and practices described above, **DEFENDANT** has wrongfully terminated **PLAINTIFF** because of her gender and actual or perceived sexual orientation, in violation of New York State Human Rights Law.

135.   **PLAINTIFF** is a member of a protected class and suffered an adverse employment action when she was wrongfully terminated, as described further, *supra*, although she was qualified to perform her job and had been performing her jobs well for over five (5) years.

27

136. **DEFENDANT** knew or should have known that their actions constituted unlawful discrimination on the basis of gender and sexual orientation and/or showed reckless disregard for **PLAINTIFF'S** statutorily protected rights.

137. As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE SIXTH CAUSE OF ACTION**
**AGAINST DEFENDANT FOR WRONGFUL TERMINATION**
**IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**

138. **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

139. By the acts and practices described above, **DEFENDANT** has wrongfully terminated **PLAINTIFF** because of her gender and actual or perceived sexual orientation, in violation of New York City Human Rights Law.

140. **PLAINTIFF** is a member of a protected class and suffered an adverse employment action when she was wrongfully terminated, as described further, *supra*, although she was qualified to perform her job and had been performing her jobs well for over five (5) years.

141. **DEFENDANT** knew or should have known that their actions constituted unlawful discrimination on the basis of gender and sexual orientation and/or showed reckless disregard for **PLAINTIFF'S** statutorily protected rights.

142. As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

## AS FOR THE SEVENTH CAUSE OF ACTION
## AGAINST DEFENDANT FOR UNLAWFUL RETALIATION
## IN VIOLATION OF TITLE VII

143.   **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

144.   **PLAINTIFF** engaged in multiple protected activities by (1) requesting a change in her employment terms commensurate with that of her male counterparts, (2) filing a complaint with **DEFENDANT'S** Human Resources office in April 2014 (*See* **Exhibit N**), and also (3) filing multiple Charges of Discrimination with the EEOC in 2014 describing her claims of discrimination and unequal pay because of her gender (*See* **Exhibit A**, **Exhibit B**, **Exhibit C**).

145.   **DEFENDANT** was aware of **PLAINTIFF'S** complaints and yet instead of addressing **PLAINTIFF'S** concerns of discrimination and unequal pay, **DEFENDANT** relocated **PLAINTIFF'S** office and ultimately terminated her employment because **PLAINTIFF** had complained about her unequal compensation and disparate treatment.

146.   **PLAINTIFF'S** office relocation and her termination would not have occurred if she had not raised these concerns with **DEFENDANT** and reported them to the EEOC.

147.   By the acts and practices described above, **DEFENDANT** has retaliated against **PLAINTIFF** for having complained about discrimination on the basis of gender in violation of Title VII.

148.   **DEFENDANT** knew or should have known that their actions constituted unlawful retaliation and/or showed reckless disregard for **PLAINTIFFS'** statutorily protected rights.

149.   As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE EIGHTH CAUSE OF ACTION**
**AGAINST DEFENDANT FOR UNLAWFUL RETALIATION**
**IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**

150.    **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

151.    **PLAINTIFF** engaged in multiple protected activities, including (1) requesting a change in her employment terms commensurate with that of her straight, male counterparts, (2) filing a complaint with **DEFENDANT'S** Human Resources office in April 2014 (*See* **Exhibit N**), and also (3) filing multiple Charges of Discrimination with the EEOC in 2014 describing her claims of discrimination and unequal pay (*See* **Exhibit A**, **Exhibit B**, **Exhibit C**).

152.    **DEFENDANT** was aware of these complaints and yet **DEFENDANT** failed to address **PLAINTIFF'S** concerns, and instead **DEFENDANT** relocated **PLAINTIFF'S** office and ultimately terminated her employment because **PLAINTIFF** had complained about her disparate treatment.

153.    **PLAINTIFF'S** office relocation and her termination would not have occurred if she had not raised these concerns with **DEFENDANT** and reported them to the EEOC.

154.    By the acts and practices described above, **DEFENDANT** has retaliated against **PLAINTIFF** for having complained about discrimination on the basis of gender and actual or perceived sexual orientation in violation of New York State Human Rights Law.

155.    **DEFENDANT** knew or should have known that their actions constituted unlawful retaliation and/or showed reckless disregard for **PLAINTIFF'S** statutorily protected rights.

156.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

## AS FOR THE NINTH CAUSE OF ACTION
## AGAINST DEFENDANT FOR UNLAWFUL RETALIATION
## IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW

157.   **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

158.   **PLAINTIFF** engaged in multiple protected activities, including requesting a change in her employment terms commensurate with that of her straight, male counterparts, filing a complaint with **DEFENDANT'S** Human Resources office (*See* **Exhibit N**), and filing multiple Charges of Discrimination with the EEOC describing her claims of discrimination and unequal pay (*See* **Exhibit A**, **Exhibit B**, **Exhibit C**).

159.   **DEFENDANT** was aware of these complaints and yet **DEFENDANT** failed to address **PLAINTIFF'S** concerns, and instead **DEFENDANT** relocated **PLAINTIFF'S** office and ultimately terminated her employment because **PLAINTIFF** had complained about her disparate treatment.

160.   **PLAINTIFF'S** office relocation and her termination would not have occurred if she had not raised these concerns with **DEFENDANT** and reported them to the EEOC.

161.   By the acts and practices described above, **DEFENDANT** has retaliated against **PLAINTIFF** for having complained about discrimination on the basis of gender and actual or perceived sexual orientation in violation of New York City Human Rights Law.

162.   **DEFENDANT** knew or should have known that their actions constituted unlawful retaliation and/or showed reckless disregard for **PLAINTIFF'S** statutorily protected rights.

163.   As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

## AS FOR THE TENTH CAUSE OF ACTION
## FOR HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF TITLE VII

164.    **PLAINTIFF** repeats and reiterates each and every allegation contained in the foregoing paragraphs through with the same full force and effect as if hereinafter set forth at length.

165.    **PLAINTIFF** was subjected to unwelcome and antagonistic treatment because of her gender which was pervasive and made it impossible for her to properly perform her job and/or excel in her rainmaking capabilities and business development opportunities.

166.    **PLAINTIFF** was scrutinized by **DEFENDANT** and consistently treated differently than her male counterparts performing the same or similar work in regards to her expense approvals and the value of her work.

167.    **PLAINTIFF** was further disparaged by **DEFENDANT** when they relocated her office with complete disregard for the effect this would have on her ability to perform her job.

168.    This treatment of **PLAINTIFF** was hostile and unacceptable as it created an environment which unreasonably interfered with **PLAINTIFF'S** work performance.

169.    By the acts and practices described above, **DEFENDANT** has created, permitted and subjected **PLAINTIFF** to a hostile work environment because of her gender in violation of Title VII.

170.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE ELEVENTH CAUSE OF ACTION**
**FOR HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**

171.    **PLAINTIFF** repeats and reiterates each and every allegation contained in the foregoing paragraphs through with the same full force and effect as if hereinafter set forth at length.

172.    **PLAINTIFF** was subjected to unwelcome and antagonistic treatment because of her gender and actual or perceived sexual orientation, which was pervasive and made it impossible for her to properly perform her job and/or excel in her rainmaking capabilities and networking opportunities.

173.    In response to a request for Mr. Bernstein to attend pitches with LGBTQ attorneys and other potential clients, **PLAINTIFF** was yelled at and disparaged for even making such an attempt.  This treatment of **PLAINTIFF** was hostile and unacceptable as it created an environment which unreasonably interfered with **PLAINTIFF'S** work performance.

174.    By the acts and practices described above, **DEFENDANT** has created, permitted and subjected **PLAINTIFF** to a hostile work environment because of her gender in violation of New York State Human Rights Law.

175.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE TWELFTH CAUSE OF ACTION**
**FOR HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**

176.    **PLAINTIFF** repeats and reiterates each and every allegation contained in the foregoing paragraphs through with the same full force and effect as if hereinafter set forth at length.

177.    **PLAINTIFF** was subjected to unwelcome and antagonistic treatment because of her gender and actual or perceived sexual orientation, which was pervasive and made it impossible for her to properly perform her job and/or excel in her rainmaking capabilities and networking opportunities.

178.    In response to a request for Mr. Bernstein to attend pitches with LGBTQ attorneys and other potential clients, **PLAINTIFF** was yelled at and disparaged for even making such an attempt.

179.    This treatment of **PLAINTIFF** was hostile and unacceptable as it created an environment which unreasonably interfered with **PLAINTIFF'S** work performance.

180.    By the acts and practices described above, **DEFENDANT** has created, permitted and subjected **PLAINTIFF** to a hostile work environment because of her gender in violation of New York City Human Rights Law.

181.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE THIRTEENTH CAUSE OF ACTION**
**FOR FAILURE TO PROPERLY INVESTIGATE PLAINTIFF'S COMPLAINTS**
**IN VIOLATION OF TITLE VII**

182.    **PLAINTIFF** repeats and reiterates each and every allegation contained in the foregoing paragraphs through with the same full force and effect as if hereinafter set forth at length.

183.    **PLAINTIFF** had numerous concerns with the way in which she was treated by **DEFENDANT** and despite her repeated efforts to resolve these problems with **DEFENDANT** in good faith, **DEFENDANT** refused to take seriously her concerns or even show her the dignity of

responding to her formal complaint, which she filed with Human Resources Department on April 8, 2014 (*See* **Exhibit N**).

184.    **DEFENDANT** failed to properly investigate **PLAINTIFF'S** claims, or take **PLAINTIFF'S** concerns seriously, and instead **DEFENDANT** challenged **PLAINTIFF'S** assertions of wrongdoing and forced her to go to great lengths to establish her claims without the benefits and/or protections of a suitable investigation. **DEFENDANT'S** failure to appropriately handle her complaints thereby caused **PLAINTIFF** to spend excessive and unnecessary time defending her concerns, which prevented **PLAINTIFF** from being able to focus on her business development efforts and otherwise perform her job.

185.    **PLAINTIFF** remained open and willing to work with **DEFENDANT** towards an appropriate solution to the concerns she had raised, but **DEFENDANT** failed to discharge their obligations to properly analyze the errors which **PLAINTIFF** had identified, such as **DEFENDANT'S** misallocation of expenses to **PLAINTIFF**. **DEFENDANT'S** failure to properly investigate and/or correct this error hindered **PLAINTIFF'S** ability to advance her business develop efforts as she was prevented from utilizing an appropriate expense budget.

186.    **DEFENDANT'S** failure to properly investigate and/or take corrective actions also forced **PLAINTIFF** to accept **DEFENDANT'S** Third Employment Terms, which did not equalize or properly redress **PLAINTIFF'S** underpayment, and under which **PLAINTIFF** alleges she earned less despite the fact that she brought a significant amount of revenue and future work to **DEFENDANT** from clients she has developed and originated.

187.    **DEFENDANT'S** failure to properly investigate and/or take corrective actions also led to the relocation of **PLAINTIFF'S** office, which caused **PLAINTIFF** embarrassment and isolation from the attorneys with whom she normally worked.

188.    **DEFENDANT** not only failed to properly investigate **PLAINTIFF'S** complaints, but also failed to take any corrective action, and ultimately terminated **PLAINTIFF'S** employment based on many of the same issues **PLAINTIFF** had attempted to resolve through her complaints.

189.    By the acts and omissions described above, **DEFENDANT** has failed to properly investigate **PLAINTIFF'S** complaints and/or make their findings known and/or take corrective action to remedy the errors **PLAINTIFF** identified because of **PLAINTIFF'S** gender in violation of Title VII and such failure caused **PLAINTIFF** substantial harm, including but not limited to preventing **PLAINTIFF** from utilizing an appropriate expense budget, forcing **PLAINTIFF** to accept the Third Employment Terms, relocating **PLAINTIFF'S** office, and restricting **PLAINTIFF'S** ability to perform her job.

190.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

### AS FOR THE FOURTEENTH CAUSE OF ACTION
### FOR FAILURE TO PROPERLY INVESTIGATE PLAINTIFF'S COMPLAINTS
### IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW

191.    **PLAINTIFF** repeats and reiterates each and every allegation contained in the foregoing paragraphs through with the same full force and effect as if hereinafter set forth at length.

192.    By the acts and omissions described above, **DEFENDANT** has failed to properly investigate **PLAINTIFF'S** complaints and/or make their findings known and/or take corrective action to remedy the errors **PLAINTIFF** identified because of her gender, actual or perceived sexual orientation, and advocacy in the LGBTQ community in violation of New York State Human Rights Law, and such failures caused **PLAINTIFF** substantial harm, including but not limited to preventing **PLAINTIFF** from utilizing an appropriate expense budget, forcing **PLAINTIFF** to

accept the Third Employment Terms, relocating **PLAINTIFF'S** office, and restricting **PLAINTIFF'S** ability to perform her job.

193.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE FIFTEENTH CAUSE OF ACTION**
**FOR FAILURE TO PROPERLY INVESTIGATE PLAINTIFF'S COMPLAINTS**
**IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**

194.    **PLAINTIFF** repeats and reiterates each and every allegation contained in the foregoing paragraphs through with the same full force and effect as if hereinafter set forth at length.

195.    By the acts and omissions described above, **DEFENDANT** has failed to properly investigate **PLAINTIFF'S** complaints and/or make their findings known and/or take corrective action to remedy the errors **PLAINTIFF** identified because of her gender, actual or perceived sexual orientation, and advocacy in the LGBTQ community in violation of New York City Human Rights Law, and such failures caused **PLAINTIFF** substantial harm, including but not limited to preventing **PLAINTIFF** from utilizing an appropriate expense budget, forcing **PLAINTIFF** to accept the Third Employment Terms, relocating **PLAINTIFF'S** office, and restricting **PLAINTIFF'S** ability to perform her job.

196.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continue to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE SIXTEENTH CAUSE OF ACTION**
**AGAINST DEFENDANT FOR UNEQUAL PAY**
**IN VIOLATION OF EQUAL PAY ACT**

197.   **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

198.   **PLAINTIFF** alleges that **DEFENDANT** paid **PLAINTIFF** substantially less than **PLAINTIFF'S** male counterparts who performed the same or similar work on jobs requiring equal skill, effort, and responsibility under similar working conditions.

199.   **PLAINTIFF'S** base salary ranged from Seventy Five Thousand Dollars ($75,000.00) to One Hundred Seventy Five Thousand Dollars ($175,000.00), which is substantially less than what male attorneys doing similar work, with similar experience and skills, were paid by **KAYE SCHOLER**.

200.   Upon information and belief, the base salaries of **DEFENDANT'S** male employees who perform similar jobs range from Five Hundred Thousand Dollars ($500,000.00) to over One Million Dollars ($1,000,000.00) per year.

201.   Upon information and belief, male attorneys who performed the same or similar work, with similar experience and skill, but were compensated significantly more by **DEFENDANT** include but are not limited to Larry Feldman, an attorney who Mr. Zifchak acknowledged had a job description similar to **PLAINTIFF**.

202.   **PLAINTIFF** was also not given the standard incentives, such as Origination Credit for her business development, which not only further caused her to be underpaid, but disincentivized partners from helping her develop business because they only received Transfer Origination Credit when they worked with her, which is much less valuable than standard Origination Credit.

203.   **PLAINTIFF** was repeatedly forced to sign contracts that severely underpaid her.  When

her supervisor, Mr. Gartner, did approve her Second Employment Terms, which came closer to paying her at an equal rate, those terms were revoked by **DEFENDANT** and **PLAINTIFF** was told she had to either disavow her request for an appropriate increase in pay and go back to her initial First Employment Terms or accept **DEFENDANT'S** Third Employment Terms, which severely undervalued her work, or else she would be out of a job (*See* **Exhibit M**, 2014 Agreement).

204.   **PLAINTIFF** alleges that there is no legitimate basis for **DEFENDANT'S** failure to compensate her equally to her male counterparts who were performing the same or similar duties as her.

205.   As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

## AS FOR THE SEVENTEENTH CAUSE OF ACTION AGAINST DEFENDANT FOR UNEQUAL PAY IN VIOLATION OF NEW YORK STATE EQUAL PAY LAW

206.   **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

207.   **PLAINTIFF** alleges that **DEFENDANT** paid **PLAINTIFF** substantially less than **PLAINTIFF'S** male counterparts who performed the same or similar work on jobs requiring equal skill, effort, and responsibility under similar working conditions.

208.   **PLAINTIFF'S** employment terms, including but not limited to base salary, bonus, and incentives, was substantially less than male attorneys doing similar work, with similar experience and skills, at **KAYE SCHOLER**.

209.   **PLAINTIFF** alleges that there is no legitimate basis for **DEFENDANT'S** failure to compensate her equally to her male counterparts who were performing the same or similar duties as her.

210.   As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE EIGHTEENTH CAUSE OF ACTION**
**AGAINST DEFENDANT FOR UNLAWFUL RETALIATION**
**IN VIOLATION OF FAIR LABOR STANDARDS ACT AND EQUAL PAY ACT**

211.   **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

212.   **PLAINTIFF** engaged in multiple protected activities by (1) requesting a change in her employment terms commensurate with that of her male counterparts, (2) filing a complaint with **DEFENDANT'S** Human Resources office in April 2014 (*See* **Exhibit N**), and (3) filing multiple Charges of Discrimination with the EEOC describing her claims of unequal pay because of her gender (*See* **Exhibit A**, **Exhibit B**, **Exhibit C**).

213.   **DEFENDANT** was aware of **PLAINTIFF'S** complaints and yet instead of addressing **PLAINTIFF'S** concerns of unequal pay, **DEFENDANT** relocated **PLAINTIFF'S** office and ultimately terminated her employment because **PLAINTIFF** had complained about her unequal compensation and disparate treatment.

214.   **PLAINTIFF'S** office relocation and her termination would not have occurred if she had not raised these concerns with **DEFENDANT** and reported them to the EEOC.

215.    By the acts and practices described above, **DEFENDANT** has retaliated against **PLAINTIFF** for having complained about discrimination on the basis of gender in violation of the Fair Labor Standards Act and the Equal Pay Act.

216.    **DEFENDANT** knew or should have known that their actions constituted unlawful retaliation and/or showed reckless disregard for **PLAINTIFFS'** statutorily protected rights.

217.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

**AS FOR THE NINETEENTH CAUSE OF ACTION
AGAINST DEFENDANT FOR UNLAWFUL RETALIATION
IN VIOLATION OF NEW YORK LABOR LAW AND NEW YORK EQUAL PAY LAW**

218.    **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

219.    **PLAINTIFF** engaged in multiple protected activities by (1) requesting a change in her employment terms commensurate with that of her male counterparts, (2) filing a complaint with **DEFENDANT'S** Human Resources office (*See* **Exhibit N**), and (3) filing multiple Charges of Discrimination with the EEOC describing her claims of unequal pay because of her gender (*See* **Exhibit A**, **Exhibit B**, **Exhibit C**).

220.    **DEFENDANT** was aware of **PLAINTIFF'S** complaints and yet instead of addressing **PLAINTIFF'S** concerns of unequal pay, **DEFENDANT** relocated **PLAINTIFF'S** office and ultimately terminated her employment because **PLAINTIFF** had complained about her unequal compensation and disparate treatment.

221.    **PLAINTIFF'S** office relocation and her termination would not have occurred if she had not raised these concerns with **DEFENDANT** and reported them to the EEOC.

41

222.    By the acts and practices described above, **DEFENDANT** has retaliated against **PLAINTIFF** for having complained about discrimination on the basis of gender in violation of the New York Labor Law and the New York Equal Pay Law.

223.    **DEFENDANT** knew or should have known that their actions constituted unlawful retaliation and/or showed reckless disregard for **PLAINTIFFS'** statutorily protected rights.

224.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

<u>**AS FOR THE TWENTIETH CAUSE OF ACTION**</u>
<u>**AGAINST DEFENDANT FOR BREACH OF CONTRACT**</u>

225.    **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

226.    **PLAINTIFF** alleges that **DEFENDANT** has consistently failed to fulfill their employment agreements with her, including but not limited to **DEFENDANT'S** revocation in November 2013 of **PLAINTIFF'S** Second Employment Terms, which had been approved by Mr. Gartner in June 2013.

227.    Further, **PLAINTIFF'S** First Employment Terms stated that if **KAYE SCHOLER** wanted to renew **PLAINTIFF'S** employment terms, they would increase her commissions on the first Two Hundred Fifty Thousand Dollars ($250,000.00) in collections from Thirty Five Percent (35%) to Fifty Percent (50%) (**<u>Exhibit G</u>**, First Employment Terms), however **PLAINTIFF** alleges that **DEFENDANT** refused to honor this agreement.

228.    **PLAINTIFF** further alleges that **DEFENDANT** required her to perform substantial work outside of the scope of the duties of her employment and failed to compensate her for such work,

including but not limited to **DEFENDANT'S** requirement in 2012 that **PLAINTIFF** coordinate a Supplier Diversity Program for Novartis, one of **KAYE SCHOLER'S** biggest clients.   This project required a substantial amount of **PLAINTIFF'S** time, which she was not compensated for, and which was outside of the scope of the terms of her employment.

229.    **DEFENDANT** also prevented **PLAINTIFF** from fulfilling her primary responsibility, which was to "develop legal business for the Firm primarily in the LGBT and other diverse legal markets," (*See* **Exhibit M**), by improperly scrutinizing her expenses and refusing to properly support her efforts to set up pitches with potential clients.

230.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.


### AS FOR THE TWENTY-FIRST CAUSE OF ACTION AGAINST DEFENDANT FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

231.    **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

232.    **PLAINTIFF** alleges that **DEFENDANT** has intentionally and wrongfully interfered with her abilities, opportunities, and incentives to develop and continue business relationships and contacts.

233.    For example, **PLAINTIFF** asserts that Mr. Bernstein refused to bring LGBTQ counsel to a pitch **PLAINTIFF** had scheduled for him with Charles Katzenstein, the General Counsel of TF Cornerstone, who is a business contact of **PLAINTIFF'S**.   Mr. Katzenstein had specifically requested that LGBTQ counsel attend this pitch and **PLAINTIFF** alleges that Mr. Bernstein not

only refused but also became agitated with **PLAINTIFF** and told her, in a loud and hostile manner, that if Mr. Kazenstein cared about whether or not an LGBTQ lawyer is on the pitch, then he does not want him as a client.

234.     Mr. Bernstein and Mr. Gliatta, the Co-Chairs of **DEFENDANT'S** Real Estate Group also refused to send anyone from **DEFENDANT'S** Real Estate Group to a meeting **PLAINTIFF** had scheduled with Madison Grose and Ellis Rinaldi, Co-General Counsel at Starwood Capital, who are also **PLAINTIFF'S** business contacts.

235.     These actions not only humiliated **PLAINTIFF** but interfered with her relationships with these business contacts and further injured her relationships with many other business contacts who learned about these incidents.

236.     Ultimately **PLAINTIFF** was precluded from pursuing real estate-related business, despite the fact that this had a significant adverse impact on not only **PLAINTIFF'S** income, as real estate-related business comprised one-third of her strategic plan, but also on her reputation in the community.

237.     **DEFENDANT** also improperly scrutinized **PLAINTIFF'S** business development expenses, failing to sufficiently support her rainmaking efforts, and weakening **PLAINTIFF'S** relationships with business contacts and community members.

238.     Further, **DEFENDANT** refused to give **PLAINTIFF** Origination Credit, and yet when partners attended pitches with **PLAINTIFF**, **DEFENDANT** still only gave them Transfer Origination Credit, which is much less valuable than standard Origination Credit, thereby disincentivizing them from working with **PLAINTIFF** to develop business, which caused further harm to **PLAINTIFF'S** standing and ability to make and develop business connections.

239.     **PLAINTIFF** further alleges that **DEFENDANT** contacted individuals in **PLAINTIFF'S** network, without **PLAINTIFF'S** knowledge and/or permission, which not only caused **PLAINTIFF** embarrassment but adversely affected her reputation with her business contacts.

240.     For example, upon information and belief, William Tannenbaum, a partner and head of **DEFENDANT'S** IP & Technology Transactions Group, opened matters with Guy Kern-Martin at Barclays Capital, who is **PLAINTIFF'S** business contact, without **PLAINTIFF's** knowledge and/or consent.

241.     Further, **PLAINTIFF** alleges that **DEFENDANT** has invited many of her business contacts, including Charles Katzenstein, Jeff Haas, and Kim Hopkins, to **DEFENDANT'S** events, without **PLAINTIFF'S** knowledge and/or approval, which was humiliating for **PLAINTIFF** when these contacts inquired with **PLAINTIFF** about these events and **PLAINTIFF** did not know about them.

242.     Further, **PLAINTIFF** alleges that **DEFENDANT** interfered with her relationships with many corporate partners of the National Gay and Lesbian Chamber of Commerce, of which **PLAINTIFF** is the Chair of the Legal Industry Council, when **DEFENDANT** failed to keep its policies in alignment with nationally recognized standards of LGBT equality.  This not only caused embarrassment for **PLAINTIFF** but damaged her business relationships, including but not limited to her relationship with Brian Holbrook, Assistant General Counsel of Toyota Financial Services.

243.     As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

## AS FOR THE TWENTY-SECOND CAUSE OF ACTION
## AGAINST DEFENDANT FOR FRAUDULENT INDUCEMENT

244.   **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

245.   **PLAINTIFF** alleges that **DEFENDANT** knowingly and fraudulently induced **PLAINTIFF** to work at a greatly reduced salary under false pretenses and with the intent of defrauding **PLAINTIFF** of the equal benefits of her employment.

246.   **PLAINTIFF** alleges that Mr. Gartner made a number of false representations to **PLAINTIFF** regarding material terms of her agreements with **DEFENDANT**, which Mr. Gartner knew would not be upheld by **DEFENDANT**, despite the fact that Mr. Gartner knew that **PLAINTIFF** was relying on these representations and would not have entered into said agreements but for his representations.

247.   For example, **PLAINTIFF** alleges that Mr. Gartner represented to **PLAINTIFF** when she was hired in 2009 that she would be on track to become a Partner provided she met her obligations to bring in business, which **PLAINTIFF** relied on when she entered into contact with **DEFENDANT**.  Further, **PLAINTIFF** asserts that she met such obligations, but then Mr. Gartner claimed she could not be made Partner and provided no justification.

248.   Further, **PLAINTIFF'S** First Employment Terms, offered to her in 2009 by Jeffrey Scheine, stated that if **KAYE SCHOLER** wanted to renew **PLAINTIFF'S** employment terms, they would increase her commissions on the first Two Hundred Fifty Thousand Dollars ($250,000.00) in collections from Thirty Five Percent (35%) to Fifty Percent (50%) (**Exhibit G**, First Employment Terms).  **PLAINTIFF** relied on this promise when she agreed to the First Employment Terms, however **PLAINTIFF** alleges that **DEFENDANT** refused to honor this

agreement without explanation and/or justification.

249.     **PLAINTIFF** further alleges that she was told by Mr. Gartner when she was first hired in

2009 that the reason she would not receive the Origination Credit for her clients was because the

Origination Credit needed to serve as an incentive to partners to work with her on business

development.  However, **PLAINTIFF** later learned that, upon information and belief, partners

who worked with her to bring in business were never going to be given standard Origination Credit,

and instead were only given Transfer Origination Credit, which is much less valuable than standard

Origination Credit.

250.     **PLAINTIFF** relied on Mr. Gartner's and Mr. Scheine's representations when she agreed

to the First Employment Terms and yet they knew or should have known that only giving partners

Transfer Origination Credit when working with **PLAINTIFF** would disincentivize partners from

working with **PLAINTIFF** to develop business and create an environment of isolation,

devaluation and unfair compensation for **PLAINTIFF**.

251.     **PLAINTIFF** was assured by Mr. Gartner and Mr. Scheine, before she agreed to the First

Employment Terms, that she would be able to effectuate her strategic plan, one-third of which was

comprised of real estate-related business, despite the fact that, upon information and belief, Mr.

Gartner and Mr. Scheine knew or should have known that **DEFENDANT'S** Real Estate

Department would not work with **PLAINTIFF** to make contacts and/or develop business.

252.     Ultimately, **PLAINTIFF** was explicitly precluded from pursuing real estate-related

business by the conduct of **DEFENDANT'S** Real Estate Department Co-Chairs, Mr. Bernstein

and Mr. Gliatta, which had a significant adverse impact on her income and her ability to develop

business.

253.   Finally, in June 2013, after **PLAINTIFF** raised concerns regarding her rate of pay compared to similarly-situated male employees, Mr. Gartner represented to **PLAINTIFF** that **DEFENDANT** would agree to the Second Employment Terms, and this representation was confirmed by representations made by Arthur Brown, Emanuel Cherney, and Vincent Sama. However, **DEFENDANT** then revoked the Second Employment Terms despite the fact that **PLAINTIFF** had been relying on these promised terms when she agreed to continue working for **DEFENDANT** for over seven (7) months.

254.   **PLAINTIFF** further alleges that **DEFENDANT** induced her to perform work outside of the scope of her employment terms with no intent to compensate her for such work.

255.   **PLAINTIFF** further alleges that **DEFENDANT** knew or should have known that **PLAINTIFF** detrimentally relied upon their fraudulent promises in agreeing to sign contracts and continuing to work for **DEFENDANT**.

256.   As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

### AS FOR THE TWENTY-THIRD CAUSE OF ACTION AGAINST DEFENDANT FOR UNJUST ENRICHMENT

257.   **PLAINTIFF** repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

258.   **DEFENDANT** has been enriched by **PLAINTIFF'S** substantial contributions to **DEFENDANT'S** business, in not only her business development efforts but also her substantial work that **DEFENDANT** required **PLAINTIFF** to perform outside the terms of her contract.

259.   Further, **DEFENDANT** was significantly enriched by **PLAINTIFF'S** work when she

worked in reliance on the Second Employment Terms, which **PLAINTIFF** alleges Mr. Gartner promised her in June 2013, but then **DEFENDANT** revoked and forced **PLAINTIFF** to accept **DEFENDANT'S** Third Employment Terms, which did not equalize or properly redress **PLAINTIFF'S** underpayment, and under which **PLAINTIFF** alleges she earned less despite the fact that she brought a significant amount of revenue and future work to **DEFENDANT** from clients she has developed and originated.

260.   **PLAINTIFF** alleges that **DEFENDANT** required her to perform substantial work outside the scope of her contractual duties, and for which she was not compensated, including but are not limited to coordinating a Supplier Diversity Program for Novartis, billing on numerous client matters, creating and implementing CLEs, overseeing summer associate legal assignments; participating in Lavender Law interviews, participating in calls as an EB-5 expert, and working with the firm to source pro bono work.

261.   **PLAINTIFF** alleges that **DEFENDANT** required her to perform this work, despite the fact that it was outside of the terms of her written contracts and caused her to redirect her efforts away from implementing her strategic plan of business development, and instead only perform the tasks required by **DEFENDANT**, whether or not she deemed them to advance her business development goals.

262.   **PLAINTIFF** made valuable professional investments into and sacrifices for **DEFENDANT'S** benefit, for which **PLAINTIFF** has not been compensated.

263.   **DEFENDANT** has received significant benefits from not only **PLAINTIFF'S** work, but PLAINTIFF'S substantial business contacts, at **PLAINTIFF'S** expense and it is against equity and public policy for **DEFENDANT** to retain these benefits without compensating **PLAINTIFF** for not only the work she was required to perform by **DEFENDANT** outside the terms of her

contract, but also the work **PLAINTIFF** performed when she was relying on the Second Employment Terms, which **DEFENDANT** then revoked, as well as the clients **DEFENDANT** has acquired since the termination of **PLAINTIFF'S** employment, which **PLAINTIFF** had previously worked to bring in.

264.    As a direct result of the actions of **DEFENDANT**, **PLAINTIFF** has suffered injuries and damages and continues to suffer such injuries, including embarrassment, humiliation, emotional distress, mental anguish, and loss of wages, salaries, benefits, and promotional opportunities.

### PRAYER FOR RELIEF

**WHEREFORE, PLAINTIFF** demands judgment as follows:

a.    Declaring that the acts and practices complained of herein are violations of Title VII, New York State Human Rights Law, New York City Human Rights Law, Equal Pay Act, New York Equal Pay Law, Fair Labor Standards Act, and/or New York Labor Law, as well as **KAYE SCHOLER'S** policies and/or procedures, including its employment handbook and/or any other relevant statutes and/or provisions;

b.    Directing **DEFENDANT** to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

c.    Directing **DEFENDANT** to make **PLAINTIFF** whole, as she would be but for **DEFENDANT'S** unlawful conduct, and to make **PLAINTIFF** whole, including but not limited to payment of the amount by which **PLAINTIFF'S** compensation was deficient compared to those of similarly situated males, as well as all earnings she would have received but for **DEFENDANT'S** unlawful conduct, including but not limited to back pay, front pay, lost wages,

salaries, pension, bonuses, and other lost benefits, pursuant to Title VII, New York State Human Rights Law, New York City Human Rights Law, Equal Pay Act, and/or New York Equal Pay Law as well as any other relevant statutes and/or provisions, in an amount not less than Five Million Dollars ($5,000,000);

d.      Directing **DEFENDANT** to pay **PLAINTIFF** an additional amount as compensatory damages for her pain and suffering, pursuant to Title VII, New York State Human Rights Law, and/or New York City Human Rights Law, as well as any other relevant statutes and/or provisions, in an amount not less than One Million Dollars ($1,000,000);

e.      Directing **DEFENDANT** to pay **PLAINTIFF** an additional amount as punitive damages for **DEFENDANT'S** willful and/or reckless disregard for **PLAINTIFF'S** statutorily protected rights pursuant to Title VII, New York State Human Rights Law, and/or New York City Human Rights Law, as well as any other relevant statutes and/or provisions in an amount not less than Five Million Dollars ($5,000,000);

f.      Directing **DEFENDANT** to pay **PLAINTIFF** an additional amount, doubling all damages awarded, as liquidated damages for **DEFENDANT'S** willful violation of the Equal Pay Act, New York Equal Pay Law, Fair Labor Standards Act, and/or New York Labor Law, as well as any other relevant statutes and/or provisions in an amount not less than Five Million Dollars ($5,000,000);

g.      Directing **DEFENDANT** to pay **PLAINTIFF** an amount not less than One Million Dollars ($1,000,000) for Breach of Contract;

h.      Directing **DEFENDANT** to pay **PLAINTIFF** an amount not less than One Million Dollars ($1,000,000) for Tortious Interference with Business Relations;

i.    Directing **DEFENDANT** to pay **PLAINTIFF** an amount not less than One Million Dollars ($1,000,000) for Fraudulent Inducement;

j.    Directing **DEFENDANT** to pay **PLAINTIFF** an amount not less than One Million Dollars ($1,000,000) for Unjust Enrichment;

k.    Awarding **PLAINTIFF** such costs and pre- and post-judgment interest as is allowed by law;

l.    Awarding **PLAINTIFF** her reasonable attorneys' fees and costs, pursuant to Title VII, New York State Human Rights Law, New York City Human Rights Law, Equal Pay Act, New York Equal Pay Law, Fair Labor Standards Act, and/or New York Labor Law, as well as any other relevant statutes and/or provisions; and

m.    Granting such other and further relief as this Court deems just and proper.


Date:   May 13, 2015
        New York, NY


                          _____~//s//~_____
                          Erica T. Kagan, Esq.
                          THE KURLAND GROUP
                          *Attorneys for Plaintiff*
                          160 Broadway, East Building, 11th Floor
                          New York, New York 10038
                          (212) 253-6911 (t)
                          (212) 614-2532 (f)
                          kagan@kurlandassociates.com